IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RODNEY ALVERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO 2:16-CV-928-MHT-CSC |
| JEFFERSON DUNN, | ) | |
| Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

## **I.  INTRODUCTION**[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Rodney Alverson, a state inmate, in which he alleges that as a result of being placed in segregation for an alleged homosexual act with another prisoner he was forced to sleep without a mattress for five days and he suffered back and neck pain.  (Doc. 1 at pp. 5-6).  He further alleges that his pain was made worse when Defendant "Sgt Mcdonald picked up the plaintiff in his arms . . . and carried plaintiff back to D-dorm at a jogg {sic} and placed plaintiff on the bottom step leading into D-dorm".  (Doc. 1 at pp. 6-7).  Alverson brings claims for deliberate indifference as a result of his alleged lack of medical treatment and based upon his conditions of confinement.  He also brings claims alleging that excessive

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

force was used against him and his due process rights were violated.   Alverson names as the correctional defendants the following: Jefferson Dunn, Commissioner; Edward Ellington, Warden of Draper Correctional Facility; and Correctional Officers Timothy McCorvey, Miss Davis, Lorenzo Mills, Mr. Mcdonald and Officer Jessie.  He also names as defendants his medical providers including Corizon Health Services and Miss Copeland, Administrator of Corizon, and Mr. Justin Oden, health care provider employed by Corizon.

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Alverson's medical records, addressing the claims raised in the complaint.  In these documents, the medical and correctional defendants maintain they did not act with deliberate indifference to Alverson's medical needs and the correctional defendants deny they subjected Alverson to unconstitutional conditions, used excessive force against him or denied him due process.

After reviewing the special reports filed by the defendants, the court issued an order on February 1, 2017 directing Alverson to file a response to each of the arguments set forth by the defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  (Doc. 40 at pp. 1-2).  The order specifically cautioned that "**unless within ten (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance

with the law." (Doc. 40 at p. 3). Alverson filed a sworn response to this order on September 21, 2017. (Doc. 89).

Pursuant to the directives of the order entered on February 1, 2017, the court now treats the defendants' reports as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II. FACTS

The plaintiff states that on October 13, 2016, he was placed in D-dorm, a restrictive privilege dorm, after being accused of committing a sexual act with another prisoner. While in D-dorm, the plaintiff alleges that he was not provided a pillow or a mattress for 5 days "because there was not enough for all inmates housed in D-dorm." (Doc. 1 at p. 5). After about three days without a mattress, the plaintiff claims that he "started having {sic} sharp pains in his back, but made it into the chow hall to eat." (Doc. 1 at p. 6). After eating, however, the plaintiff claims that he could not stand or walk because of the sharp pain in his back. *Id.*

At chow hall, the plaintiff asked Correctional Officers McCorvey and McDonald to take him to the Health Care Unit, but they refused his request. *Id.* Next, the plaintiff claims that Correctional Officer McDonald "picked up the plaintiff in his arms approved by Lt. McCorvey and carried the plaintiff back to D-dorm at a jogg, {sic} and placed plaintiff on the bottom step leading into D-dorm." (Doc. 1 at pp. 6-7). Defendant McCorvey denies this allegation. (Doc. 31-4 at p.2). The plaintiff also claims that Correctional Officers Mills and Davis arrived at D-dorm during this time and he asked them to take him to the Health Care Unit, but both refused. (Doc. 1 at p. 7).

Next, the plaintiff claims Correctional Officer Davis told Correctional Officer Mills to "get the plaintiff into D-dorm". (Doc. 1 at pp. 7-8). He further claims that Correctional Officers Mills and Jessie "carried the plaintiff up the stairs leading into D-dorm against the plaintiff's will." (Doc. 1 at p. 8). During this process, he alleges that the officers "ramed {sic} the plaintiff's head into a steel locker cage." *Id.* After the defendant correctional officers took the plaintiff to D-dorm, he states that "they laid the plaintiff on the floor just inside the enterence {sic} . . . and grabbed a pice {sic} of a mattress and laid it beside the plaintiff and then left." *Id.* The correctional defendants deny these allegations. (Docs. 39-2; 39-3. The plaintiff also claims that he was never given the required 72-hour notice about why he was being housed in D-dorm. (Doc. 1 at p. 8). He also claims that he was left on the floor for two days and was unable to eat or go to the bathroom until other inmates started helping him. (Doc. 1 at p. 9).

The plaintiff states that on October 20, 2016, he put in a sick call slip with Corizon and was seen on October 21, 2016, at the health care unit where x-rays of his neck and back were performed. He also states that on October 25, 2016, he was seen by Defendant Oden, a health care provider, and was prescribed "mild pain relievers and muscel {sic} rub" and was issued a bottom bunk and a no standing profile. *Id.* Then on November 14, 2016, the plaintiff again saw Defendant Oden for treatment of his pain and was informed that Oden would order a "free world appointment" to check on the plaintiff's back and neck. The plaintiff complains that this was never done. (Doc. 1 at p. 10). He also claims that he wrote letters to the Warden and Commissioner complaining about his treatment, but never received a response or any action. He further claims that he filed a grievance

with Corizon on November 29, 2016.  (Doc. 1 at pp. 9-10).  The plaintiff states that before

November 26, 2016, he was removed from D-dorm and was reassigned to kitchen duty as

a cart pusher "which is an easy job requires no lifting other than a few trays and sheet

cooking pans . . . [and] is not strainful {sic} on plaintiff's neck or back . . . and seems to

relive {sic} some pain due to this excersize {sic}."  (Doc. 1 at p. 11).

The plaintiff also claims that when he was processed into D-dorm on October 13,

2016, that certain personal property was taken from him and kept in a store room.  He

claims that other inmates assigned to D-dorm broke into the property room and stole his

property.  (Doc. 1 at pp. 11-12).  He alleges that the correctional defendants failed to ensure

the return of this stolen property and did not act responsibly when keeping it stored.  (Doc.

1 at p. 12).   The plaintiff does not state the capacity in which he sues the correctional

defendants.   Against all the defendants he seeks a combination of punitive and

compensatory damages.  (Doc. 1 at pp. 16-17).

Defendant Justin Oden, Certified Registered Nurse Practitioner employed by

Corizon Health Care testified by affidavit as follows:

> My name is Justin Oden, CRNP.  I am a Certified Registered Nurse
> Practitioner licensed to practice as a nurse practitioner in the state of
> Alabama.  I am over the age of nineteen (19) years, and have personal
> knowledge of all matters stated herein.
>
> I am currently a nurse practitioner at the St. Clair Correctional Facility
> located in Springville, Alabama.
>
> I was at all relevant times a nurse practitioner at the Staton
> Correctional Facility located in Elmore County, Alabama.  I am, and was at
> all relevant times, employed by Corizon, LLC.   Corizon holds the contract
> with the Alabama Department of Corrections to provide health care related
> services to inmates incarcerated at the Alabama state correctional facilities.
> Corizon has held the contract with the Alabama Department of Corrections
> since November 1, 2007.

I am aware of the lawsuit and claims filed by inmate Rodney Alverson (AIS # 132431).

I am aware that Mr. Alverson is currently incarcerated at the Draper Correctional Facility located in Elmore County, Alabama.

I am aware that Mr. Alverson alleges that he did not receive appropriate medical attention and medications since complaining of pain in his back beginning on October 18, 2016.

I have attached hereto, in chronological order, Mr. Alverson's complete medical chart for 2016.

The medical records reveal that on October 13, 2016, Mr. Alverson had no visible injuries and informed the LPN who saw Mr. Alverson that he did not know why he needed an assessment from the nurse.

On October 18, 2016, Mr. Alverson completed a sick call request stating that he was having problems with his back and that he could not move, walk or stand.

On October 20, 2016, Mr. Alverson was seen in the health care unit at Draper and evaluated by the LPN.  Mr. Alverson complained of back pain in the middle of his back.  The nurse noted that Mr. Alverson stated that his back hurt when he tried to stand up.  Mr. Alverson stated that his back had been hurting for approximately two days.

A referral was made for Mr. Alverson to be seen in the emergency room on October 20, 2016.  However, Mr. Alverson did not show up for his appointment on October 20, 2016.

On October 21, 2016, Mr. Alverson was seen by Domineek Guice, CRNP.  Mr. Alverson complained he had back pain for approximately four days.  Ms. Guice ordered x-rays on October 21, 2016.

X-rays of Mr. Alverson's cervical and lumbar spine were in fact taken on October 21, 2016.  The results of those x-rays, as read by the radiologist, were as follows:

CERVICAL SPINE 2 OR 3 VIEWS: RESULTS:  There is anatomic alignment of the cervical vertebrae.  The vertebral bodies show moderate degenerative osteophytic spurring.  No fracture is seen, however.   Posterior elements are intact.  Occipitocervical junction is normal as is the C1-C2 relationship.   No prevertebral soft tissue swelling or radiopaque foreign body is seen. CONCLUSION:  Moderate degenerative changes of the cervical spine.

THORACIC SPINE AP AND LAT: RESULTS:  There is anatomic alignment of the thoracic vertebrae.  The vertebral bodies show modest degenerative osteophytic spurring.  No fracture is seen, however.   CONCLUSION:   Modest osteoarthritis of the thoracic spine.

LUMBAR SPINE AP AND LAT: RESULTS:  There is anatomic alignment of the lumbar vertebrae.  The vertebral bodies show moderate degenerative osteophytic spurring.  No fracture or subluxation is seen, however.   CONCLUSION: Moderate osteoarthritis of the lumbar spine.

I personally saw Mr. Alverson on October 25, 2016.  Mr. Alverson informed me that his back had been hurting for approximately five days after he slept on steel with no mattress.  I reviewed Mr. Alverson's x-rays that showed no problems besides mild naturally occurring degenerative changes.

On October 25, 2016, I wrote restrictions for Mr. Alverson which included no prolonged standing for an excess of ten minutes.

On October 27, 2016, Mr. Alverson completed a sick call request stating that his neck was beginning to hurt and that it had gotten worse in the last two days.

An appointment was made for Mr. Alverson to be seen on October 31, 2016.  However, Mr. Alverson refused to be seen at his sick call appointment.

On October 31, 2016, Mr. Alverson completed a medical grievance. Mr. Alverson stated that he saw the doctor on October 25, 2016 and that his back and neck were hurting and that he was in need of a neck and back brace and special pillow.

Mr. Alverson was informed that when he was seen on October 25, 2016, he was given a bottom bunk profile and a profile of no prolonged standing.  Mr. Alverson was advised that if he still was having problems with back pain, that he was to sign up again for sick call.

On November 3, 2016, Mr. Alverson completed another sick call request.  Mr. Alverson stated that his neck was still hurting and that he was experiencing pops in his neck that was constant.

Mr. Alverson was again seen by a nurse on October 9, 2016.  Mr. Alverson complained of constant aches and pain in his neck and back.  The nurse noted that the x-rays taken on October 21, 2016 were normal and non-problematic.  Mr. Alverson was given a prescription of Motrin 400 mg for seven days.  Mr. Alverson was also provided with some analgesic balm.

On October 14, 2016, Mr. Alverson was written medical restrictions which included no prolonged standing for one month.

On December 5, 2016, a follow up appointment was made by the nurse for Mr. Alverson to be seen by the medical provider due to his ongoing back/neck pain.

Mr. Alverson was seen by the medical provider on October 20, 2016. An evaluation was made by the medical provider on December 20, 2016 of Mr. Alverson.   Mr. Alverson complained of pain in his neck for approximately two months.  The medical provider noted that the x-rays taken on October 21, 2016 indicated osteoarthritis.  The objective results showed

that Mr. Alverson was suffering from musculoskeletal issues. However, Mr. Alverson did not have any range-of-motion issues and was again prescribed Motrin and prednisone.

There is nothing in Mr. Alverson's medical chart to indicate that he has at any time been denied or delayed necessary medical care for his medical needs.

When Mr. Alverson complained of neck and back pain, a series of x-rays were taken, all of which were negative and only showed Mr. Alverson to suffer from mild osteoarthritis.

There is nothing to indicate that Mr. Alverson did not receive appropriate nursing care/medical care for his medical needs.

Mr. Alverson at all times received medications appropriate for his medical situation.

Being personally familiar with Mr. Alverson's medical complaints, medical needs, objective tests and medical appointments, it is my opinion that Mr. Alverson always received nursing care and attention within the standard of care of nurses practicing nursing in the state of Alabama. My opinions are based upon my first-hand knowledge of Mr. Alverson's situation and nursing care, as well as my education, training and experience.

(Doc. 29-1 at pp. 1-7).

Defendant Michelle Sagers-Copeland, Health Services Administrator for Corizon Health Care, also testified by affidavit as follows:

My name is Michelle Sagers-Copeland. I am over the age of nineteen (19) years, and I have personal knowledge as to all matters stated herein. I am a Registered Nurse ("RN") duly licensed to practice nursing in the state of Alabama. I am currently employed by Corizon, LLC ("Corizon") as the Health Services Administrator ("HAS") at the Staton Correctional Facility located in Elmore County, Alabama.

Corizon currently holds the contract with the Alabama Department of Corrections ("ADOC") to provide health care services to inmates incarcerated within Alabama State Correctional facilities. As the HAS, my primary responsibilities are for the administration of the health care unit of the Staton and Draper Correctional Facilities. As the HSA, I seldom, if ever, provide hands-on nursing care to inmates incarcerated at the Staton and Draper Correctional Facilities.

The health care unit at the Staton Correctional Facility employs physicians, nurse practitioners, physician's assistants, RNs and LPNs to provide medical care and nursing care to inmates incarcerated at the Staton

and Draper Correctional Facilities.  There is also a Director of Nursing
("DON") at the Staton Correctional Facility.  The DON, in turn, reports to
me as the Health Services Administrator.

I have at no time ever provided nursing care directly to Rodney
Alverson (AIS 132431).  I have reviewed Mr. Alverson's medical chart and
it does not contain any notations of my name where I provided nursing care
to Mr. Alverson.  Mr. Alverson is provided medical care by the medical
providers and nursing care by the CRNPs, MPs, RNs and LPNs.  I have not
provided any direct nursing care to Mr. Alverson during his incarceration at
the Staton and/or Draper Correctional Facility.  After reviewing the medical
records of Mr. Alverson, it is my opinion that Mr. Alverson has at all times
received nursing care within the standard of care of nurses practicing nursing
in the state of Alabama.

(Doc. 29-2 at p.2).

## III.  DISCUSSION[2]

### A.    Absolute Immunity — Correctional Defendants

To the extent Alverson lodges claims against the correctional defendants, in their

official capacity and seeks monetary damages, these defendants are entitled to absolute

immunity.  Official capacity lawsuits are "in all respects other than name, . . . treated as a

suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh

Circuit has held,

the Eleventh Amendment prohibits federal courts from entertaining suits by
private parties against States and their agencies [or employees]. There are
two exceptions to this prohibition: where the state has waived its immunity
or where Congress has abrogated that immunity. A State's consent to suit
must be unequivocally expressed in the text of [a] relevant statute. Waiver

---

[2] The court limits its review to the allegations set forth in the complaint.  (Doc . 1).  *Gilmour v. Gates,
McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint
through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of
Corrections*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint
at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim);
*Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (refusing to address a
new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

> may not be implied. *Id.* Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted). Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.1990)). In light of the foregoing, defendant Byron Caylor, is entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from him in his official capacity. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

**B.    Deliberate Indifference Generally**

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007).  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments

Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

## C.   Deliberate Indifference to Medical Needs.

Alverson alleges that the medical defendants acted with deliberate indifference to his medical needs when they denied him adequate medical treatment for his back and neck pain. (Doc. 1 at pp. 9-10). Furthermore, to the extent Alverson can be understood to

complain that the correctional defendants are responsible for ensuring that he received appropriate medical treatment, the court will also address this argument.  (Doc. 1 at pp. 6-8).  These assertions entitle Alverson to no relief.

### 1.  <u>Standard of Review</u>.

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something more must be shown.  Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor v.*

*Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248,1255 (11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).   Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).   To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to

warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent."  *Massey v. Montgomery County Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)].  Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel,* 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotation marks).  To show deliberate indifference, the

plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (citation and internal quotation marks omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm.").

    **2.** **<u>Medical Defendants.</u>** Alverson alleges that the medical defendants acted with deliberate indifference to his medical needs when they denied him adequate medical treatment for neck and back pain. (Doc. 1 at p. 2). More specifically, he alleges that on October 20, 2016, he put in    a sick call slip with Corizon and was seen on October 21,

2016, at the health care unit where x-rays of his neck and back were performed.  He also states that on October 25, 2016, he was seen by Defendant Oden, a health care provider, and was prescribed "mild pain relievers and muscel {sic} rub" and was issued a bottom bunk and a no standing profile.  *Id.*  Then on November 14, 2016, the plaintiff again saw Defendant Oden for treatment of his pain and was informed that Oden would order a "free world appointment" to check on the plaintiff's back and neck.  The plaintiff complains that this was never done.  (Doc. 1 at p. 10).

The medical defendants adamantly deny they acted with deliberate indifference to Alverson's medical needs during the time relevant to this complaint or at any other time. Indeed, the plaintiff's own allegations conclusively show that x-rays were taken of his back and neck, he was prescribed medication for his pain, and he was issued a bottom bunk and no standing profile.  (Doc. 1 at p. 2).  Moreover, Justin Oden, Certified Registered Nurse Practitioner, who personally treated Alverson and reviewed all pertinent medical records, testified that in addition to a number of other visits by Alverson to the medical provider,

> "[a]n evaluation was made by the medical provider on December 20, 2016 of Mr. Alverson.  Mr. Alverson complained of pain in his neck for approximately two months.  The medical provider noted that the x-rays taken on October 21, 2016 indicated osteoarthritis.  The objective results showed that Mr. Alverson was suffering from musculoskeletal issues.  However, Mr. Alverson did not have any range-of-motion issues and was again prescribed Motrin and prednisone."

(Doc. 29-1 at p. 6).  Moreover, Defendant Michelle Sagers-Copeland, Health Services Administrator for Corizon and a registered nurse, states that "after reviewing the medical records of Mr. Alverson, it is my opinion that Mr. Alverson has at all times received nursing

care within the standard of care of nurses practicing nursing in the state of Alabama." (Doc. 29-2 at p.2).

Additionally, the court's own independent review of the medical records conclusively demonstrates that the summary judgment is due to be granted on the plaintiff's deliberate indifference claim. (Doc. 29-1 pp. 1-43). Specifically, there is no evidence upon which the court could conclude that any member of the medical staff who provided treatment to Alverson acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Furthermore, whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). In addition, to the extent Alverson complains that his physicians should have allowed continuous prescriptions for pain relievers or pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference. Indeed, Alverson's self-serving statements of a lack of

due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same).  In addition, Alverson has failed to present any evidence showing that the manner in which the medical defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded.   The record is therefore devoid of evidence— significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Alverson.  Consequently, summary judgment is due to be granted in favor of the medical defendants.

**3.  <u>Correctional Defendants</u>.**  To the extent Alverson argues that the correctional defendants acted in a manner to prevent him access to treatment from professional medical personnel while incarcerated in the Staton Correctional Facility, the court concludes that this argument lacks merit.  Indeed, it is clear from the medical records that the correctional defendants were not in any way involved in decisions regarding the medical treatment provided to Alverson as these decisions are made solely by healthcare professionals employed by Corizon.

Accordingly, the Court concludes that Alverson has failed to establish deliberate indifference on the part of the correctional defendants.  Specifically, Alverson has not

demonstrated that these defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to his health. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference)." Consequently, summary judgment is due to be granted in favor of the correctional defendants on Alverson's claim alleging deliberate indifference arising from the actions of medical personnel in treating his pain.

Insofar as Alverson seeks to hold the correctional defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that the correctional defendants exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129

S.Ct. 1949. Thus, liability for actions of the correctional defendants could attach to the other named defendants only if these defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that the correctional defendants did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Alverson. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the treatment provided to Alverson and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, the correctional defendants can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Alverson's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Alverson must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Alverson has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the correctional defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.   In addition, Alverson has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Alverson had continuous access to medical personnel and received treatment for his pain.   The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the correctional defendants with respect to liability based on the theory of respondeat superior.  Furthermore, even had Alverson presented a proper basis for the claims lodged against the correctional defendants, the evidentiary materials before the Court, including Alverson's medical records, demonstrate that health care personnel did not act with deliberate indifference to his medical needs.

**D.    Deliberate Indifference -- Challenge to Conditions**

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*,

452 U.S. 337, 347 (1981).   The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).   Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.   *Id*.   Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.   Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).   Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny.   *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32.   For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004).   As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective

and a subjective inquiry. *Farmer*, 511 U.S. at 834.  The court previously identified the applicable standard relevant to establishment of the objective and subjective elements of an Eighth Amendment claim.  *See supra*. at 11-12 .

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes,* 452 U.S. at 347.  "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency. . . .  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards.  *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986); *see Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . .  To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment

purposes.  Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991) (emphasis in original).

As previously noted, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.  "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted).  As the foregoing makes clear, mere negligence "does not justify liability under section 1983[.]" *Id.*

The plaintiff alleges that his constitutional rights were violated when, as a result of being placed in the Behavior Modification Dorm for an alleged homosexual act with another prisoner, he was forced to sleep without a mattress, and only on a blanket, for five days which caused him to suffer back and neck pain.  (Doc. 1 at pp. 5-6).  The defendants dispute the claim that the plaintiff was denied a mattress during his confinement in the Behavior Modification Dorm.  Rather, Sgt. Lorenzo Mills testified that "[a]ll inmates are issued mattresses when they are reassigned to the Behavior Modification Dorm."  (Doc. 39-2).  Further, Warden Edward Ellington confirmed this practice and stated that "[i]f inmate Alverson did not get a mattress, he should have advised the dormitory officer or

shift commander." (Doc. 39-1 at p.1). The plaintiff does not allege that he ever requested a mattress be provided to him upon his placement in the Behavior Modification Dorm.

However, for the purposes of summary judgment the Court must accept as evidence the plaintiff's allegations that he was denied a mattress and slept only on a blanket for five days in the Behavior Modification Dorm and will address his claim that this act constituted deliberate indifference. *See Sears v. Roberts,* 922 F. 3d 1199, 1206 (11th Cir. 2019). The Eleventh Circuit has specifically held that in the prison context "temporarily ha[ving] to sleep upon a mattress on the floor or on a table is not necessarily a constitutional violation." *Hamm,* 774 F.2d at 1566. However, the Eleventh Circuit cautioned that the lower court should have "expressly considered the claims [of conditions and medical treatment] together." *Id.* at 1567. The Court will do so now.

The Court is persuaded that its prior conclusion -- the medical defendants provided constitutionally adequate medical care to the plaintiff for the pain in his neck and back- undermines his conditions claim. Specifically, x-rays were taken of his back and neck, which indicated that he suffered from osteoarthritis, but had no "range-of-motion" issues, and he was prescribed medication for his pain. (Doc. 29-1 at p.5). The Court recognizes that the plaintiff would have been more comfortable in a bed, or on something more than a blanket on the floor as he alleges. However, the Court also recognizes that the Constitution does not require "comfortable prisons" and the Court now concludes that these conditions the plaintiff experienced do not rise to the level of being "inhumane". *See, Farmer*, 511 U.S. at 832. Moreover, the Court recognizes that the lack of a bed was temporary as the plaintiff claims that he was without a mattress for five days. (Doc. 17-2). Thus, the Court

concludes that the failure to provide a mattress to plaintiff while in the Behavior Modification Dorm fails to establish deliberate indifference on the part of defendants. Accordingly, the Court concludes that the plaintiff's allegations fail to satisfy the objective element of an Eighth Amendment violation and summary judgment is therefore due to be granted on this claim.  *Caldwell*, 748 F.3d at 1099.

## E.      Due Process Claim

The plaintiff alleges that his due process rights were violated when he was placed in restrictive custody following his alleged sexual encounter with another inmate because he was never given the required 72-hour notice about why he was being housed in the Behavior Modification Dorm.  (Doc. 1 at p. 8).  However, the undisputed evidence shows that on October 13, 2016, following the plaintiff's sexual encounter, he was notified by Sgt. Briggs that he would receive "disciplinary action for the sexual offense-non-forcible/soliciting"; he was taken to the health care unit for a medical assessment and was reassigned to the Behavior Modification Dormitory.  (Doc. 39-4 at p. 1).

To the extent the plaintiff can be heard to claim that his due process rights were violated when he was not given a hearing prior to being placed in the Behavior Modification Dormitory, the Court concludes that the plaintiff fails to demonstrate that his placement in this dormitory "present[ed] the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 486 (1995).  Indeed, except for the allegations concerning his bedding, which this Court has previously addressed, the plaintiff makes no allegations of any deprivations resulting from his dorm assignment.  Rather, he admits that he was allowed to go to the chow hall

with other prisoners.  (Doc. 1 at p. 6).  Thus, the Court concludes that the plaintiff fails to demonstrate that his confinement "exceed[ed] similar, but totally discretionary, confinement in either duration or degree of restriction." *Sandin, id.*    Accordingly, the Court concludes that summary judgment is due to be granted on plaintiff's due process claim.[3]

## F.    Excessive Force Claim

With respect to his excessive force claim, the plaintiff alleges that on October 18, 2016, Correctional Officers Mills and Jessie "carried the plaintiff up the stairs leading into D-dorm against the plaintiff's will."  (Doc. 1 at p. 8).  During this process, he alleges that the officers "ramed {sic} the plaintiff's head into a steel locker cage."  *Id.*    After the defendant correctional officers took the plaintiff to D-dorm, he states that "they laid the plaintiff on the floor just inside the enterence {sic} . . .  and grabbed a pice {sic} of a mattress and laid it beside the plaintiff and then left."  *Id.*   The correctional defendants deny these allegations.  (Docs. 39-2; 39-3).  Indeed, Sgt. Lorenzo Mills testified that on October 18, 2016, "[i]nmate Alverson walked upstairs to the Behavior Modification Dorm on his own.  I stood behind him so that he wouldn't fall.  At no time did I or any other officer ram

---

[3]  The plaintiff also claims that when he was processed into D-dorm on October 13, 2016, that certain personal property was taken from him and kept in a store room.  He claims that other inmates assigned to D-dorm broke into the property room and stole his property.  (Doc. 1 at pp. 11-12).  He alleges that the correctional defendants failed to ensure the return of this stolen property and did not act responsibly when keeping it stored.  (Doc. 1 at p. 12).  However, the record contains no evidence that the plaintiff ever reported this incident.  Moreover, the court concludes that this allegation fails to state a claim for a deprivation of the plaintiff's constitutional due process rights because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," as "the Constitution does not guarantee due care on the part of state officials."  *Sacramento v. Lewis,* 523 U.S. 833, 849, 228 S. Ct 1708, 1718, 140 L.Ed. 2d 1043 (1998).

his head into a steel locker cage." (Doc. 39-2 at p. 1). However, for purposes of summary judgment the court must accept the plaintiff's allegations as evidence, and on that basis will address his claim of excessive force. *See Sears v. Roberts,* 922 F. 3d 1199, 1206 (11th Cir. 2019).

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (internal quotations and citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims v. Artuz*, 230 F.3d 14, 22 (2nd Cir. 2000) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson*, 503 U.S. at 8. The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Id*. (internal quotations omitted). To establish the subjective element, a plaintiff must demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims*, 230 F.3d at 21. With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson*, 503 U.S. at 8. In addition, "the use of excessive physical

force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4. "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Summarizing the excessive force standard in the prison context, the Eleventh Circuit wrote:

> [u]nder the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7-8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300-1301 (11th Cir. 2002).

Recently, the Eleventh Circuit applied the *Whitley* factors in a §1983 action brought by a pro se prisoner for injuries he received during the inspection of his cell after he failed to follow an order from the defendant prison officers. *Miles v. Jackson,* 757 F. App'x. 828

(11th Cir. 2018).  In *Miles,* the court identified the five factors relevant in determining whether force was applied "maliciously or sadistically" as "(1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the threat 'reasonably perceived by the responsible officials,' . . . (4)'any efforts made to temper the severity of the use of a forceful response,'" and  "(5) [t]he absence of serious injury." *Id.,* at 829 citing *Hudson,* 503 U.S at 7; quoting *Whitley,* 475 U.S. at 321.

In considering the application of the *Whitley* factors to the instant case, the court recognizes at the outset that the plaintiff alleges because "he was in pain in his back and could not stand up or walk" Officers Davis and Mills took plaintiff "against his will" to D-Dorm and during this process "ramed {sic} the plaintiff's head into a steel locker cage" and then "laid the plaintiff on the floor just inside the enterence {sic} leading into D-Dorm." (Doc. 1 at pp. 7-8).  Although Defendant Mills denies these allegations, (Doc. 22-1 at pp. 1-2), the court must accept the plaintiff's statement as evidence to be considered on a motion for summary judgment.  *See Sears v. Roberts,* 922 F. 3d 1199, 1206 (11th Cir. 2019).  Based upon the plaintiff's own allegations, it is clear to the court that the "need" for the force arose from the plaintiff's inability to stand up or walk and from his failure to return to D-Dorm. (Doc. 1 at pp. 7-8).  Indeed, the court views the plaintiff's statement that he was taken to D-Dorm "against his will" as evidence from the plaintiff that he was refusing an order to return to D-Dorm.  Thus, assuming the defendants used force on the plaintiff as he claims, the court concludes that an inmate's failure to follow orders from correctional officers justifies the use of some force.  Indeed, the Eleventh Circuit has affirmed the "need" for force where the plaintiff first failed to obey an order and then

"evaded [the officer's] attempt to get him to comply". *Miles,* 757 F. App'x at 830 citing *Bennett,* 898 F.2d at 1533 ("The need for the use of force [was] established by the undisputed evidence that [the prisoner] created a disturbance.")

The question then becomes whether the need to ensure the plaintiff's compliance with the order justified the amount of force used. *Miles, id.*  In this specific instance, the plaintiff alleges that "Sgt. Mills grabbed the plaintiff's left leg and arm then ordered officer Jessie to grab the plaintiff's right leg and arm and both carried the plaintiff up the stairs leading into D-Dorm."  He further claims that "during this process they ramed {sic} the plaintiff's head into a steel locker cage" and then "laid the plaintiff on the floor just inside the enterence {sic} leading into D-Dorm."  (Doc. 1 at pp. 7-8).  In *Miles*, the Eleventh Circuit recognized that the "use of a takedown" which included the prisoner being tackled onto his bed and then onto the floor and being slammed against a wall was not excessive when the prisoner "failed to obey a jailer's orders."  757 F. App'x at 829-30.  Furthermore, the court notes the plaintiff fails to present any evidence that the force used against him was malicious or sadistic.  Indeed, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm."  *Whitley,* 475 U.S. at 320-21.  Thus, the court concludes that the questions of the need for force and its proportionate use are answered in favor of the defendants.

The court also concludes that the third and fourth *Whitley* factors weigh against the plaintiff.  Although there is no evidence that the plaintiff reacted violently when dealing with the defendants, there is evidence based upon the plaintiff's own allegations that he did

not wish to return to D-Dorm and was returned there "against his will".  Thus, the court concludes that the defendants could have reasonably perceived the plaintiff presented some threat for creating a disturbance.  Finally, the court concludes that based upon the plaintiff's own allegations, the defendants' use of force was tempered because he was "carried" up the stairs to D-Dorm and was "laid" on the floor in D-Dorm and that "during this process" they "ramed {sic} the plaintiff's head into a steel locker cage that is located halfway between the stairs when turning to go up the second flight of stairs that are leading into D-dorm."  (Doc. 1 at p. 8).   Under the law of this circuit, these allegations fail to establish a claim for excessive force.   Rather, the plaintiff's allegations demonstrate that the defendants used restraint in carrying the plaintiff up the stairs and laying him on the floor in D-dorm and that the alleged ramming of the plaintiff's head into a locker cage appeared to be caused by the configuration of the stair well and thus was unintentional.

Finally, the court considers the extent of the injury suffered by the plaintiff.  The plaintiff was treated for neck and back pain that he claims resulted from sleeping on steel. (Doc. 29-1 at pp. 1-7).  The medical record contains no evidence of treatment for a head or neck injury resulting specifically from the alleged ramming of the plaintiff's head into a steel locker cage.  Even assuming this alleged incident aggravated the plaintiff's pain, the record reflects that he was treated with Motrin, prednisone, and analgesic balm.  *Id.* Accordingly, the court concludes that the medical evidence does not support the plaintiff's allegations of an extensive injury.  *Miles,* 757 F. App'x at 830 (No "serious injury" where the only treatment was Tylenol).  Thus, the court concludes that summary judgment is due to be granted on the plaintiff's excessive force claim.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.        The defendants' motion for summary judgment be GRANTED.

2.        Judgment be GRANTED in favor of the defendants.

3.        This case be DISMISSED with prejudice.

4.        Costs be taxed against the plaintiff.

On  or  before  N**ovember  19,  2019**  the  parties  may  file  objections  to  this Recommendation.   A party  must  specifically  identify  the  factual  findings  and  legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 5th day of November, 2019.


 /s/     Charles S. Coody
UNITED STATES MAGISTRATE JUDGE